# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Parenting and Support of | No. 80839-7-I |
| A.P. | DIVISION ONE |
| DAVID PARSONS, | UNPUBLISHED OPINION |
| Respondent/Cross Appellant, | |
| and | |
| TANYA GOODMAN, | |
| Appellant/Cross Respondent. | |

APPELWICK, J. — Tanya Goodman and David Parsons, the parents of A.P., have been involved in protracted conflict since shortly after his birth. The trial court adopted a final parenting plan for A.P. when he was two years old, following a trial. Three years later, after another trial, the court modified the parenting plan. Finding that the mother had engaged in abusive use of conflict, the court allocated sole decision-making authority to the father as to education and non-emergency healthcare and altered transportation provisions. The court declined to modify the residential schedule and denied the father's request for attorney fees. Both parties appeal.

Substantial evidence supports the court's findings. The trial court did not misapply the law or abuse its discretion with respect to the imposition of RCW 26.09.191 restrictions, transportation provisions, or the residential schedule. We

affirm the trial court's order and findings on the modification petition and the final parenting plan.

FACTS

In 2015, Parsons filed a parentage action, seeking the adoption of a parenting plan for A.P. In November 2016, the court entered the final parenting plan following a trial. That plan provided for joint decision-making and a residential schedule that gradually increased A.P.'s residential time with Parsons. When A.P. reached the age of five, the plan set forth a 50/50 residential schedule. Due to the high level of conflict between the parties, the parenting plan included an alternative dispute resolution process and required use of a parenting coordinator to facilitate the parties' communication.[1]

When it adopted the 2016 parenting plan, the court found that Goodman had not always acted in A.P.'s best interests and her conduct had potential to "undermine" A.P.'s relationship with his father. Specifically, the court found that Goodman had disparaged Parsons, secretly submitted A.P. to a child abuse examination, and instigated an abuse investigation of Parsons without concrete evidence. The court warned Goodman to refrain from communicating a "pathologized impression" of Parsons. The court stated that the parenting plan should be modified if Goodman continued to act in a manner that created a likelihood of "alienating the child from a parent or of pushing an adult's anxieties onto the child." Goodman appealed and this court affirmed the parenting plan.

---

[1] The parenting plan provided for mediation, but the court later amended the provision to require arbitration and to allow the parenting coordinator to resolve "minor" disputes with the right to seek review by the arbitrator.

See In re the Parenting & Support of A.P., noted at 6 Wn. App. 2d 1044, 2018 WL 6787917 (unpublished).

The conclusion of the trial and entry of a final permanent parenting plan did not put an end to, or in any way diminish, the conflict between the parents. A.P.'s diagnosis of autism spectrum disorder shortly after the trial and issues related to the appropriate treatment following that diagnosis and other health care issues became major sources of conflict. Other disputes involved the residential provisions, vacations, telephonic and "Facetime" access, and appropriate preschool programs. Two parenting coordinators worked intensively with the parties. The parties submitted approximately 20 issues to arbitration. The court found the mother to be in contempt in 2017 and again in 2018 for violating residential provisions of the parenting plan.[2] The mother also filed an anti-harassment petition against Parsons' spouse, Monica Parsons.[3] The trial court dismissed that petition and imposed sanctions.

The first parenting coordinator withdrew from the case after working with the parties for approximately a year. Her final status report stated, in part:

> Joint decision making is unworkable for this family, fuels conflict and results in delays that are not in [A.P.'s] best interests. In most cases, it

---

[2] Contrary to the mother's claim, this court did not overturn either finding of contempt based on Goodman's violation of parenting plan provisions. Instead, the court concluded that the finding of contempt based on nine violations of the arbitrator's ruling on telephone access could not be a basis for contempt because the ruling had not been confirmed by the court. See In re the Parenting & Support of A.P., noted at 9 Wn. App. 2d 1089, 2019 WL 3546870, *5 (unpublished). The court held that Goodman was nonetheless subject to sanctions for violating the ruling under RCW 26.09.184(4). Id. at *8.

[3] Because Parsons and his spouse share the same last name, we refer to his spouse as Monica to avoid confusion.

would be fairly easy to reallocate decision to one or the other parent. In this case, assigning a sole decision maker is complicated by the parents' radically different perceptions of [A.P.] and their polarization regarding his developmental and medical needs.

The parenting coordinator also noted longstanding concerns about the mother's "persistent negative orientation" toward the father and her "habit of interviewing the child with an eye to allegations of abuse or neglect." The parenting coordinator recommended that the mother undergo a psychological evaluation and recommended a reevaluation of the question of decision making.

The father filed a petition to modify the parenting plan.[4] A.P. was five years old at the time of trial on the modification petition in October 2019. The court appointed experts to conduct a psychological evaluation and a parenting evaluation. Clinical and forensic psychologist, Dr. Gary Wieder, conducted the parenting evaluation and submitted a 104 page report. Dr. Wieder recommended allocating sole decision-making authority to the father.

After reviewing more than 150 exhibits and hearing testimony from 12 witnesses over 6 days, the trial court entered a final parenting plan and an order and findings on the petition to modify. The court later granted the mother's motion for reconsideration, in part, and entered an amended parenting plan and final order and findings.

The court found a substantial change of circumstances and that nonresidential changes to the parenting plan were in the child's best interest. See RCW 26.09.260(10). The court determined that the mother had engaged in the abusive use of conflict. The court found that the father's request for sole

---

[4] The record on appeal does not include Parsons' petition.

decision-making authority was reasonable on that basis and in view of the history of each parent's participation in decision making. The plan provides for the father to have sole decision-making authority as to educational and non-emergency health care issues, with input from the mother. The court also found that the mother had "increased the conflict" during exchanges at the father's home. To address this, the court adjusted the transportation provisions to require the mother to arrange for third-party transportation at her expense when exchanges must occur at Parsons' home.

The court declined to reduce the mother's residential time with A.P., as requested by the father. Despite Goodman's conduct, the court found that the attachment between A.P. and Parsons remained intact, and retained the 50/50 residential schedule. The court denied the father's motion for attorney fees.[5]

Both Goodman and Parsons appeal.

## DISCUSSION

### I. Standard of Review

We review a trial court's decisions related to the welfare of children for an abuse of discretion. In re Marriage of Horner, 151 Wn.2d 884, 893, 93 P.3d 124 (2004). Relevant here, a court has authority to modify a parenting plan and impose restrictions under RCW 26.09.191, to the same extent it has the authority to do so at the time of entry of the parenting plan. In re Marriage of Watson, 132 Wn. App. 222, 232, 130 P.3d 915 (2006). We review modifications to a parenting

---

[5] The court did not require the use of a parenting coordinator in the 2019 parenting plan, but required the parties to continue to submit disputes to the same arbitrator, based on his extensive familiarity with the case.

plan for an abuse of discretion.  In re Marriage of Hansen, 81 Wn. App. 494, 498, 914 P.2d 799 (1996).  A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons.  In re Marriage of Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012).

We uphold a trial court's findings if supported by substantial evidence.  In re Marriage of Raskob, 183 Wn. App. 503, 510, 334 P.3d 30 (2014).  Substantial evidence exists if the record contains evidence of a sufficient quantity to persuade a fair-minded person of the truth of the declared premise.  Katare, 175 Wn.2d at 35.  "Our role or function is not to substitute our judgment for that of the trial court or to weigh the evidence or credibility of witnesses."  In re Marriage of Rich, 80 Wn. App. 252, 259, 907 P.2d 1234 (1996).  The person challenging the findings of fact bears the burden of demonstrating that substantial evidence does not exist.  In re Marriage of Grigsby, 112 Wn. App. 1, 9, 57 P.3d 1166 (2002).  We review de novo whether the trial court's findings of fact support its conclusions of law.  Raskob, 183 Wn. App. at 510.

## II.   Goodman's Appeal

### A. Abusive Use of Conflict

Goodman claims the court did not apply the same standard to both parties when it found that she, and not Parsons, engaged in the abusive use of conflict. She argues that the court found abusive use of conflict even though none of her behavior created a "danger of serious damage to the child's psychological development," as required by RCW 26.09.191(3)(e).  On the other hand, she

claims the court "excused" Parsons' "high conflict behavior that directly involved the child."

A court may preclude or limit any provision of the parenting plan if a parent's involvement or conduct has "an adverse effect on the child's best interests." RCW 26.09.191(3). That statute provides a nonexclusive list of factors that may have an adverse effect on the child's best interests, including "[t]he abusive use of conflict by the parent which creates the danger of serious damage to the child's psychological development." RCW 26.09.191(3)(e). A finding of abusive use of conflict does not require actual damage. In re Marriage of Burrill, 113 Wn. App. 863, 872, 56 P.3d 993 (2002). "[T]he required showing is that a danger of psychological damage exists." Id.

Here, the court found, in relevant part,

1. The Court finds the mother has engaged in abusive use of conflict. The mother was found in contempt of court on July 28, 2017 and on July 12, 2018 for intentionally withholding the child from the father in violation of the final Parenting Plan. The mother has been sanctioned pursuant to CR 11 for seeking an anti-harassment order against the stepmother in bad faith. The mother filed a motion for contempt against the father which she later withdrew, but only after the father filed a response and incurred attorney fees. The court finds credible the testimony of the stepmother Monica Parsons that: (a) at the child's occupational therapy appointment, the mother blocked her view of the child and then taunted her, and (b) at the child's medical appointment at Seattle Children's Hospital, the mother prevented her from attending the appointment and removed the child from her arms. The court finds credible the testimony of the father that: (a) the mother improperly interfered with the child receiving a flu shot and a vaccination for Hepatitis A, (b) the mother violated the November of 2016 final Parenting Plan by taking pictures from the father's "Baby Cam" located in his house that was ordered to be discontinued, (c) the mother changed the father's answers on medical intake forms for the child, and (d) the mother's

inappropriate conduct caused an autism specialist to decline evaluating the child and thus unnecessarily delayed his autism reevaluation.

. . .

3. The court finds that the father has caused unnecessary conflict with the mother, but that his conduct falls short of abusive use of conflict. For example, the father adds food coloring to the child's food even though it appears to serve no purpose other than to cause the mother distress. The mother testified credibly that the father can see the school from his home and that he spies on the mother when she drops the child off at school. The mother testified credibly that during a difficult child exchange at the father's house, the father stood behind the front door and surreptitiously audio recorded her rather than assisting with the transfer. The mother testified credibly that during the child's first day of kindergarten, the father stood-by video-recording her the entire time.

Substantial evidence in the record supports the court's finding that all of the identified incidents occurred. We do not agree that the court must have applied the legal standard unequally in order to reach different conclusions about whether the parents' conduct amounted to abusive use of conflict. The court found that Goodman engaged in both different and more extensive conduct than Parsons. The court concluded that Parsons' actions—using food coloring, watching the mother from his home when she dropped A.P. at school, audio recording the mother from behind a door, and video recording her with A.P. on the first day of kindergarten—caused unnecessary conflict. But, those actions did not involve the child in the parties' conflict and the court correctly did not find that those acts created a danger of serious damage to A.P.'s psychological development. And, contrary to Goodman's argument, the court expressly found that Parsons' conduct was inappropriate. The court addressed the misconduct

by ordering the parties not to record each other without consent and directing the father "not to spy" on Goodman at A.P.'s school.

Goodman points out that her acts were not egregious in comparison with abusive use of conflict that has occurred in other cases. For example, Goodman cites Burrill, in which the mother engaged in abusive use of conflict by, among other things, raising unfounded allegations of sexual abuse that resulted in the father's arrest and a significant disruption of the parent-child relationship. Burrill, 113 Wn. App. at 867-68. But, the conduct in Burrill was the basis for more severe restrictions than the court imposed here. Id. at 868. And, more importantly, the fact that a court relied on more serious misconduct to find abusive use of conflict in another case does not establish that the mother's actions were insufficient to support restrictions under RCW 26.09.191(3).

Goodman claims that A.P. was not involved in or aware of some of her actions, such as her legal actions against Monica and Parsons and her confrontation of Monica during A.P.'s therapy session. So, even if these actions fueled conflict between the parties, she asserts that they posed no danger of serious damage to A.P.'s psychological development.

But, Goodman concedes that a child may be psychologically harmed by parental conduct of which the child is unaware. Generally, courts find abusive use of conflict where one parent inserts a child into a parental conflict. See Burrill, 113 Wn. App. at 868. And, here, in addition to acts that A.P. was presumably unaware of, the court relied on other acts that directly involved him in

9

conflict and created a risk of alienating him from Parsons or eroding his parental trust.

Dr. Wieder concluded that Goodman engaged in the abusive use of conflict. He cited as examples the mother's actions of obstructing A.P.'s flu shot, her delay of A.P.'s autism reevaluation by accusing the designated provider of extortion, and the incident at Seattle Children's Hospital when Goodman took A.P. from Monica's arms which caused him significant distress.

Dr. Wieder explained that Goodman's overt hostility toward Monica sent harmful "messages" to A.P. and the mother's attempts to sabotage Monica's caretaking were potentially "detrimental" to him. Dr. Wieder determined that the mother exposed A.P. to "unnecessary conflict" and her actions showed "the mother's needs overriding those of her son and creating the potential detriment" to him. Dr. Wieder also testified that "frivolous litigation is a basis for abusive use of conflict," and that Goodman's actions toward Monica showed a willingness to go to "great lengths" in protest of her involvement in ways that are "harmful, and distorted, and overreactive." Dr. Wieder expressed concerns that the mother's pervasive negative views of the father and his spouse were not susceptible to change:

> So my concern is that the distorted views that I believe she has about the father and Stepmother could lead her, and likely will lead her, to both provocatively controlling behaviors and potentially overinvolvement behaviors with her child.

The trial court found that Dr. Weider's testimony was credible.

The evidence in the record is sufficient to persuade a fair-minded person that Goodman involved the child in the parties' conflict creating a danger of serious damage to his psychological development. Therefore, the court acted within its discretion by restricting the mother's decision-making authority under RCW 26.09.191(3).

B. Transportation Provisions

Goodman challenges the provision that requires her to arrange for a third-party to transport A.P. to Parsons' home. The court adopted the measure to address conflict during exchanges at the father's home:

> 6. The court finds credible the father's testimony that the mother's conduct at his home during child exchanges has increased the conflict. She unnecessarily prolongs the exchanges at his home, causing the child distress. She interferes with the child entering the father's house if the stepmother answers the door. She called the police to the father's house to help her with a child exchange even though there was no reason to seek help from law enforcement.

Goodman claims the court's finding is based on speculation that she is the cause of A.P.'s resistance to transitions. But, the testimony of Parsons, Monica, and Dr. Wieder, and video evidence support the court's finding. There was evidence that Goodman prolonged transitions, indulged A.P.'s requests, failed to encourage him to enter the house when Monica was present, and encouraged A.P. to demand Parsons' assistance. And, as recounted by the court, on one occasion, the mother sat in her vehicle with A.P. for more than an hour and then, unnecessarily, summoned police to assist her.

11

The court made no "implicit finding" about the availability of a third-party to transport A.P. on Goodman's behalf. We are not persuaded by Goodman's speculation that she might be unable to comply with the court's order.

C. Other Issues

Goodman challenges the requirement that A.P. attend school in the district where Parson lives. She claims this decision failed to take into account the traumatic brain injury she suffered in January 2018 which impacts her ability to transport A.P. during her residential time. However, the choice of school issue was not before the court in 2019. Several months earlier, the arbitrator resolved the issue after considering input from the parents and the parenting coordinator.[6] The issue of school choice is not properly before us in this appeal of the 2019 parenting plan and order and findings on modification.

Goodman also challenges the court's finding that "Dr. Weider testified credibly that the mother and father are incredibly polarized in their beliefs about what is best for the child, and that the father's views are more aligned with the views of the child's healthcare providers and educators." Contrary to Goodman's argument, substantial evidence in the record supports this finding. Dr. Weider testified consistently with other evidence in the record, that many of the mother's opinions are "out of sync" with A.P.'s health care providers. There was evidence demonstrating that although A.P. had seen as many as 30 doctors since the entry of the parenting plan and had been subjected to a wide array of medial and

---

[6] In his brief Parsons asserts that the mother sought review of the arbitrator's decision in superior court but did not appeal.

developmental exams for someone his age, there was little evidence to substantiate most of the mother's medical concerns. And, there was evidence that the mother continued to insist that A.P. suffered from ailments and injuries in the face of contrary medical evidence.

In its findings and order on modification, the court ordered the father to arrange for an autism reevaluation within six months. The mother claims the court erred by entering the parenting plan because, without the results of that evaluation, it was not possible to know what provisions are in A.P.'s best interest. We disagree. In adopting the parenting plan, the court took into account all of the evidence about A.P.'s needs and development, including his pending reevaluation. Goodman fails to establish error.

III.     Parsons' Cross Appeal

A. Residential Schedule

Parsons claims that, based on the finding of abusive use of conflict, the court should have adopted his proposed residential schedule and significantly reduced Goodman's residential time with A.P. Parsons argues that reducing the mother's residential time was warranted because the evidence showed that her alienating behaviors had already affected A.P.[7]

As explained, the court had discretion to place limitations on Goodman's involvement, including her residential time, based on its finding under RCW

---

[7] Parsons claims that A.P. has made spontaneous statements that suggest coaching by Goodman. However, he cites an exhibit that was not designated as a part of the record on appeal. To the extent that Parsons raised the issue in the parenting evaluation, the evaluator concluded the allegations could not be verified.

26.09.191(3)(e). But, the court was not required to do so. And, in addition to the evidence Parsons cites, the court considered other evidence that A.P. was attached to both parents and both have strengths. The court also considered Dr. Wieder's opinion that notwithstanding the abusive use of conflict, the court should not disturb the residential schedule and doing so would not necessarily reduce the potential impact of alienating behavior. The court did not abuse its discretion.

B. <u>Attorney Fees</u>

The court's initial order provided that Parsons could request attorney fees in a posttrial motion. Parsons apparently filed such a motion, seeking over $35,000 in fees, and the trial court denied it. The court later denied his motion to reconsider that ruling.

Parsons claims he was entitled to fees because Goodman's "undying intransigence" necessitated the modification. However, Parsons failed to designate his motion for attorney fees, the trial court's decision on the motion, or his motion for reconsideration and neither those pleadings nor the court's order are included in the record on review. A determination of intransigence is necessarily factual. <u>In re Marriage of Wixom</u>, 190 Wn. App. 719, 725, 360 P.3d 960 (2015). Without a record of the arguments raised below and the basis for the court's ruling, we are unable to review Parsons' claim that the court abused its discretion in denying his request for attorney fees. <u>See</u> <u>In re Marriage of Bobbitt</u>, 135 Wn. App. 8, 29-30, 144 P.3d 306 (2006) (this court reviews a motion for attorney fees based on intransigence for an abuse of discretion).

IV.  Attorney Fees on Appeal

Parsons seeks an award of attorney fees on appeal, arguing that Goodman's appeal is frivolous.  But, he cites CR 11 and RCW 4.84.185 and neither provides a basis to recover his fees on appeal.  We deny the request. [8]

Affirmed.

_Appelwick, J._

WE CONCUR:

_Chun, J._          _Leach, J._

---

[8] A commissioner of this court previously denied Goodman's motion to strike and request for sanctions related to Parsons' reply brief.  To the extent that Parsons' brief is improperly directed at the issues Goodman raised in her opening brief and not limited to a reply to Goodman's response to the issues he raised in his cross appeal, we disregard the improper arguments.  See RAP 10.3(c) (reply brief must be "limited to a response to the issues in the brief to which the reply brief is directed.").